**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

UNITED STATES OF AMERICA,

          Plaintiff,

                                                    CASE NO. 2:11-cr-20759 &
v.                                              2:13-mc-51567

HUSSEIN NAZZAL,                        HON. MARIANNE O. BATTANI

          Defendant.

_____/

**MEMORANDUM AND ORDER**

### I.    BACKGROUND

On July 16, 2013, Defendant Hussein Nazzal pleaded guilty to one count of conspiracy to defraud the United States in violation of 18 U.S.C. § 371 for arranging fraudulent marriages between United States citizens and foreign nationals to obtain immigration benefits. Prior to sentencing, the government filed a motion identifying two victims of the conspiracy and requested the Court to hear victim impact statements. On October 23, 2013, the Court sentenced Nazzal and heard both victims' impact statements *in camera.* Nazzal voluntarily waived his appearance during the statements and left the courtroom. On April 16, 2014, a hearing was held to determine whether the victims in this matter are entitled to restitution. Again, Nazzal declined to be present during the hearing. (Doc. 9). The Court heard testimony from two witnesses, and at the conclusion of the hearing, took the matter under advisement. For the reasons stated below, the Court finds restitution is appropriate in this matter in the amount of $79,107 to victim ZC and $222,399 to victim HM.

### II.    RELEVANT EVIDENCE

In a period of twelve years, Defendant Hussein Nazzal arranged three false marriages in order to obtain immigration benefits for his Lebanese associates. In furtherance of the conspiracy, Nazzal and the other Defendants submitted false documents to the United States Immigration and Naturalization Service and the Department of Homeland security – Citizenship and Immigration Services. According to the indictment, Nazzal also used force or threat of force to prevent witnesses from cooperating with the government investigation. Subsequently, Nazzal pleaded guilty on the indictment to conspiracy to defraud the United States and was sentenced to thirty-three months in prison. Prior to sentencing, the government identified two individuals as victims of the conspiracy: "ZC" and "HM."

The first victim, ZC, a Lebanese national, entered into a false marriage at the direction of Nazzal with Mike Murry, a United States citizen. As repayment for arranging the marriage, Nazzal forced ZC to work seven days a week for little or no pay as a waitress at his restaurant. In addition, Nazzal sexually and physical abused ZC and threatened deportation if she contacted the police. ZC testified to these instances at Nazzal's sentencing. At the restitution hearing, counsel requested $69,507 in lost compensation and $13,000 for projected psychological treatment.

In support of lost compensation, ZC submitted an estimate of the hours she worked from 1998 until 2001, the period in which she was forced to work for Nazzal. (Sealed Doc. 76, Exs. 1, 2). The rate of pay was based on the relevant minimum wage including overtime adjustments. No pay raise was assumed. Based on ZC's description of her various jobs and the amount of hours she worked, calculated lost wages came out to $69,507. Regarding psychological treatment, ZC submitted an

affidavit detailing the extent of her continued emotional distress based on the abuse she suffered.  ZC's attorney submitted an estimated treatment cost of $125 per week for two years, or $13,000 in total.  The weekly rate was based on market rates for counselors or social workers in southeast Michigan.

HM, the other victim identified by the government, is the son of ZC.  At the restitution hearing, counsel introduced a victim impact statement from HM, which echoed HM's previous testimony at the sentencing hearing.  In the statement, HM described the physical and sexual abuse he suffered at the hands of Nazzal from the ages of nine to eleven.  He described the emotional impact of the abuse and the substantial effects it continues to have on his life, including the inability to concentrate in school, panic attacks, and other mental problems.

During the restitution hearing, HM's counsel submitted evidence in support of an award of $188,799 in lost compensation and nearly $1.8 million in projected psychological treatment.  Two expert witnesses testified to HM's damages.  The first witness, Anne Sutton, is a licensed professional counselor ("LPC") who treated HM during a one-hour counseling session.  Sutton testified that the scope of her job includes assessment, diagnosis, and individual and group counseling.  Specifically, Sutton focuses on counseling survivors of sexual abuse.  In addition, she testified regarding her extensive qualifications working as a LPC for over twenty years.

Sutton testified that she reviewed HM's victim impact statement, reviewed some recent medical records, and spent an hour counseling HM.  After the session, Sutton prepared a report, which noted HM's statements and behavior during the session.  It concluded that HM required support and treatment for the abuse throughout the rest of

3

his lifetime. She recommended a coordinated counseling approach, including weekly contact with a psychiatrist, weekly contact with a therapist/counselor, weekly support group, weekly adjunct support professionals, and monthly psychiatric medications. Based on costs in the metro-Detroit area and HM's remaining life expectancy, Sutton estimated nearly $1.8 million in future treatment.

The second witness, Jacob Reed, a manager in the Dispute Advisory & Forensic Services Group at Stout Risius Ross, testified regarding HM's lost compensation resulting from the abuse. He concluded that empirical evidence supports the notion that the abuse adversely affected HM's educational opportunities and job advancement, resulting in lower earning capacity throughout his lifetime. Using past income tax returns and statistics regarding minimum wage rates, Reed calculated HM's historical and future lost wages. Total lost historical earnings equaled $47,361 and future lost wages equaled $141,438, resulting in a total of $188,799.

Reed explained that total lost historical earnings are the earnings that HM already lost as a result of the abuse, from 2006 to the end of 2013. This is the difference between "projected but-for earnings," which are the reasonable value of earnings absent any abuse based on HM's demographic profile and "reported and estimated actual earnings." Reed used HM's tax returns to report HM's actual income from 2006 to 2012, but did not calculate lost wages for 2006 to 2008 because HM indicated he was a "student" during those years and would likely not have worked full-time. Reed notes that beginning in 2009, it is reasonable to assume HM would have recognized earnings at the minimum wage level. For 2013, Reed conservatively estimated HM's income based on the minimum wage statistics: forty hours per week at

4

the relevant minimum wage level. In sum, Reed calculated that the total amount of lost wages from 2006 to 2013 was $47,361.

In addition, Reed testified that the present value of future lost wages is the difference between the "projected but-for earnings," based on HM's demographic profile, and the "estimated actual earnings", which are calculated based on minimum wage employment with a two percent annual increase for inflation and a one percent annual increase in wage level. The future lost wages accrue from 2014 to 2055, the estimated year of retirement. To present a more accurate and conservative estimate of but-for earnings, Reed factored in HM's immigrant status and placed him in the 25th percentile of his particular demographic. Because immigrants typically make less than the average wage earner, Reed adjusted but-for earnings to reasonably reflect that assumption. Thus, in any given year HM experienced a $3,000 to $9,000 loss in wages. Reed then multiplied each year's loss by a "present value factor," which reflects various wage discount rates, to calculate the "present value loss." The sum of the present value loss for the years 2014 to 2055 equals $141,438. Last, Reed added the total historical lost wages and the present value of future lost earnings to come up with a total of $188,799 in lost compensation.

At the hearing, Nazzal offered a medical report and several portions of the grand jury testimony of HM and ZC. However, the Court refused to consider the medical report because the witness was not produced for the hearing and could not be cross-examined. Counsel did not refer to any specific portions of the report during the hearing and neither the victims nor the government received an opportunity to respond. In addition, although the grand jury transcripts are part of the record, the Court will not

consider them.  Counsel did not specifically reference any portion of the transcripts at the hearing and they have no bearing on the Court's decision in this matter. Consequently, the government's pending motion to modify protective orders regarding these sealed documents is moot.

**III.** **LAW & ANALYSIS**

ZC and HM assert that they are entitled to mandatory restitution pursuant to the Mandatory Victims Restitution Act, or alternatively, discretionary restitution pursuant to the Victim Witness Protection Act.  They seek damages for lost wages and future medical treatment arising from Nazzal's physical and emotional abuse.  Nazzal argues that mandatory restitution is inappropriate because the statute does not apply to the offense to which he pleaded guilty.  In addition, he claims discretionary restitution is inappropriate because the conduct for which the victims seek damages does not form the basis of his conviction.

The Mandatory Victims Restitution Act of 1996 ("MVRA") provides that the sentencing court shall order restitution to "victim[s]" of any offense covered under the Act.  18 U.S.C. § 3663A(a)(1).  The MVRA amended the Victim Witness Protection Act ("VWPA"), 18 U.S.C. § 3663(a)(1)(A), which grants courts the discretionary authority to order restitution to victims of certain offenses.  Under both Acts, "victim" is defined as:

> [A] person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

§ 3663(a)(2); 3663A(a)(2).  The MVRA lists certain covered offenses, which includes "an offense against property . . . including any offense committed by fraud or deceit."  §

6

3663A(c)(1).  Restitution under the VWPA is authorized for offenses listed in Title 18 of the United States Code.  § 3663(a)(1)(A).

Restitution is required "in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." § 3664(f)(1)(A).  In cases involving conspiracy, courts may "order restitution for damage resulting from any conduct that was part of the conspiracy and not just from specific conduct that met the overt act requirement of the conspiracy conviction."  United States v. Elson, 577 F.3d 713, 723 (6th Cir. 2009) (internal quotations omitted).  Conversely, injuries resulting from "offenses that are not part of the [conspiracy] of which [the defendant] has been convicted" are excluded.  Id. (quoting United States v. George, 403 F.3d 470, 474 (7th Cir. 2005)).

Where the defendant is convicted by a plea of guilty rather than by a jury, "the court should look to the plea agreement, the plea colloquy, and other statements made by the parties to determine the scope of the 'offense of conviction' for purposes of restitution."  Id. (citing United States v. Akande, 200 F.3d 136, 142 (3d Cir. 1999)).  In addition, disputes "shall be resolved by the court by a preponderance of the evidence" and the government bears the burden of demonstrating each victim's loss.  18 U.S.C. § 3664(e).

## A.    Appropriate Authority for Restitution

It is clear the VWPA is applicable to Nazzal's Title 18 offense conviction.  With respect to the MVRA, however, the Court accepted Nazzal's plea on the indictment without a Rule 11 plea agreement.  Therefore, in order to determine whether Nazzal's

7

conviction is a covered offense under the MVRA, the Court looks to the plea colloquy to determine the scope of the offense of conviction.

At the plea hearing on July 16, 2013, Nazzal admitted to knowingly arranging a false marriage and helping his Lebanese associates defraud the United States by creating and submitting several false documents.  However, during his plea colloquy, Nazzal did not admit to the allegations of abuse regarding ZC and HM.  Nazzal does not mention either victim or admit to using abusive means to prevent the victims from cooperating with authorities.  In reading Nazzal's statement, the Court cannot find that the scope of the offense of conviction in this case includes the abuse alleged by the victims.  The plea colloquy is devoid of any overt acts involving abuse towards anyone, victim or otherwise, to further the conspiracy.  Nazzal only pleaded guilty to defrauding the United States through his arrangement of a false marriage and submission of several false documents to government agencies.  Consequently, the Court lacks authority to order mandatory restitution in accordance with the MVRA.

Nonetheless, the Court may award restitution under the VWPA, which grants Courts discretion to award victim restitution in cases arising under Title 18 of the United States Code.  ZC and HM both qualify as victims under the Act, as they both sustained harm directly and proximately as a result of Nazzal's offense.  Both victims testified in great detail to the abuse they suffered as part of Nazzal's efforts to conceal the conspiracy and the lasting affects it has on them today.  Together with the extensive recitation of allegations of abuse in the pre-sentence report and accompanying affidavits of the victims, there is a clear need for psychological treatment.  Moreover, Nazzal does not dispute the victims' allegations and waived his right to be present during their

8

statements and at the restitution hearing. Consequently, the Court finds by a preponderance of evidence that the abuse occurred and that ZC and HM are victims under the VWPA.

### B. Victims' Losses

In awarding restitution under the VWPA, the Court must consider (1) the amount of loss of each victim; and (2) the financial resources, earning ability, and dependents of the defendant. 18 U.S.C. § 3663(a)(1)(B)(i). The Act authorizes courts to award restitution for loss of property and psychiatric care. § 3663(b). Evidence submitted during the hearing supports both victims' claims for lost wages and psychiatric care.

On behalf of HM, two expert witnesses testified regarding the appropriate amount of psychological harm and lost wages. Regarding lost wages, the Court finds by a preponderance of the evidence that HM reasonably suffered a loss of $188,799 in total lost compensation as a result of the abuse, the amount recommended by Reed. The Court finds Reed's estimates competent and credible. In fact, Sutton's testimony that abuse victims generally make less than the average individual support Reed's estimates.

However, the Court finds the requested amount of psychological treatment excessive. Although the effects on HM will undoubtedly affect HM forever, the Court is not willing to assume HM will require over fifty years of weekly treatment to be able to function as a productive member of society. Sutton only spent one hour counseling HM. She stated that although some individuals require weekly counseling sessions, she never knew of anyone that required a lifetime of treatment. Sutton also admitted that after a certain period of intensive treatment, it would be safe to assume that the patient

9

would be able to reduce the frequency of treatment.  In addition, Sutton believed that HM was not currently attending any treatment sessions at the time.  Certainly, it is reasonable that HM will need medical treatment for an extended period of time.  However, the Court rejects the extensive treatment Sutton recommends, and based on the fact that HM is not currently undergoing treatment and only saw Sutton for a one-hour evaluation, the Court will award one psychiatric visit per month for ten years, weekly visits with a social worker or counselor for one year to be followed by one year of monthly visits.  Sutton submitted evidence that the prevailing rate in the Detroit area for psychiatric visits is $200 and the rate for counseling/therapy visits is $150, which the Court accepts.  This results in an award of $33,600 in future medical expenses.

With respect to ZC, the government provided evidence to support her claim for lost wages.  Based on minimum wage rates for her type of work and the number of hours worked for which she did not receive pay, the government estimated her lost wages in the amount of $69,507.  The Court finds by a preponderance of the evidence that this estimate is reasonable, given it assumes ZC worked for no more than minimum wage and did not factor in any wage increases.  However, regarding psychological treatment, ZC seeks weekly counseling sessions for two years.  There is no medical recommendation for the treatment requested, but evidence exists that treatment is, in fact, necessary.  The Court declines to use the rate for counseling sessions submitted by ZC's attorney, as it is based entirely on an online search.  Therefore, applying the $150 rate submitted by Sutton, the Court will award one year of weekly counseling/therapy sessions and one year of monthly counseling/therapy sessions, resulting in an award of $9,600 in future medical expenses.

### C.      Defendant's Ability to Pay

Last, the Court considers Nazzal's financial resources and obligations.   The VWPA requires sentencing courts to make factual findings regarding the defendant's financial means before ordering an award of restitution.   Importantly, this relates not to the amount of restitution, but whether restitution should be ordered at all.   See United States v. Sosebee, 419 F.3d 451, 460 (6th Cir. 2005) ("Furthermore, the Act does not require the judge to consider the defendant's financial situation in determining the *amount* of restitution but only *whether or not* restitution should be ordered.") (emphasis in original).   Although no factual findings regarding Nazzal's financial status were made at the hearing, the Court may rely upon the Presentence Investigation Report ("PSR") filed in this matter.   See United States v. Karam, 201 F.3d 320, 329 (4th Cir. 2000) (noting that "[w]e have held that a sentencing court satisfies its duty to make specific findings if it adopts a presentence report that contains adequate factual findings to allow effective appellate review of the fine or restitution") (internal quotation marks omitted).

Here, the PSR indicates that Nazzal is well-educated with two bachelor's degrees and has owned several businesses and properties with his wife.   However, most of the properties have large mortgages with little equity.   Nazzal also has four children, two above the age of eighteen.   He has no history or substance abuse and average future earning capacity.   The PSR indicates that Nazzal does not have the ability to pay a fine or costs of incarceration, but noted that he has the ability to make nominal monthly payments for restitution.   Taken together, the Court finds restitution appropriate in this case, given Nazzal's ability to make monthly restitution payments in the future.

### IV.    CONCLUSION

11

Accordingly, the Court finds Defendant LIABLE for restitution to victim ZC in the amount of $79,107and to victim HM in the amount of $222,399.   In addition, the government's motion to modify protective orders is **MOOT**.

**IT IS SO ORDERED.**

Date:   July 28, 2014                                    s/Marianne O. Battani
                                                        MARIANNE O. BATTANI
                                                        United States District Judge


<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on July 28, 2014.


                                                        s/ Kay Doaks
                                                        Case Manager